## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Robert Charles Smith, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   vs. | ) |
| | )     Case No. 1:15-cv-94 |
| Hartman Walsh Painting Company, | ) |
| Basin Electric Power Cooperative, and | ) |
| Sargent & Lundy, LLC, | ) |
| | )    **REPORT AND RECOMMENDATION** |
|     Defendants, | )    **ON MOTION FOR** |
| | )    **RELIEF FROM JUDGMENT** |
|   and | ) |
| | ) |
| Hartman Walsh Painting Company, | ) |
| | ) |
|     Defendant/Third-Party Plaintiff, | ) |
| | ) |
|   vs. | ) |
| | ) |
| Duromar, Inc., | ) |
| | ) |
|     Third-Party Defendant. | ) |

Plaintiff Robert Charles Smith seeks relief from a March 3, 2017 order that dismissed all of his claims in this personal injury litigation. When that order was issued, Smith was not represented by counsel. He is now represented and asserts a right to relief under Federal Rule of Civil Procedure 60(b), claiming excusable neglect and mistake. (Doc. #197).

### Background and Summary of Recommendation

This litigation arises from a workplace incident. At the time of the incident, Smith was working at a power plant owned by defendant Basin Electric Power Cooperative. Basin contracted with defendant Sargent & Lundy, LLC to provide certain services for a

retrofit project at the power plant. Basin contracted with defendant Hartman Walsh

Painting Company to install internal coatings on large tanks that were part of the

project, with the tank coatings manufactured by third-party defendant Duromar, Inc.

Smith was on the work site as Duromar's technical field representative.

      The order from which Smith seeks relief stated:

> The unambiguous evidence establishes that Basin and Sargent & Lundy are
> entitled to indemnification from Hartman Walsh; Hartman Walsh is entitled
> to indemnification from Duromar; and Duromar is entitled to
> indemnification from Smith. Because of his previous settlement agreements
> with Duromar, Smith would ultimately be responsible for satisfying any
> judgment he received from Basin, Sargent & Lundy, or Hartman Walsh.

(Doc. #176, p. 2). The order granted Hartman Walsh's motion for summary judgment,

granted Duromar's motion to dismiss Hartman Walsh's third-party complaint on the

sole basis of circuity of obligation, granted Basin's motion to dismiss or for summary

judgment on the sole basis of circuity of obligation, granted Sargent Lundy's motion for

summary judgment on the sole basis of circuity of obligation, and denied Smith's

motion for summary judgment. Smith's amended complaint against Harman Walsh,

Basin, and Sargent Lundy was dismissed with prejudice. Hartman Walsh's third-party

complaint against Duromar was also dismissed with prejudice.

      In the current motion, Smith contends that "reasonable minds may conclude [he]

is not obligated to indemnify Duromar, Inc. for its contractual indemnification liability

related to indemnity agreements involving Duromar and Defendants" and that,

therefore, circuity of obligation should not have been found. (Doc. #197, p. 2). Smith's

current motion relies largely on Carter v. EOG Resources, Inc., No. 4:12-cv-003, 2015

WL 12867758 (D.N.D. Mar. 12, 2015),[1] a case holding that an indemnity agreement is to be interpreted under North Dakota law to "indemnify a party for claims based upon contractually assumed liability only when such a construction is very clearly intended by the parties." Id. at *6. Smith asserts that, under Carter, his agreement to indemnify Duromar should be interpreted to cover only Duromar's tort liabilities and not its contractual liabilities. (Doc. #197, p. 6).

Basin, Hartman Walsh, Sargent Lundy, and Duromar filed a joint response opposing Smith's motion. (Doc. #200). Their response argues that Smith's motion does not satisfy any of Rule 60(b)'s criteria for relief; the joint response does not address the merits of Smith's circuity of obligation argument.

In this court's opinion, Smith has not satisfied requirements for relief under Rule 60(b). This Report and Recommendation, therefore, does not address Smith's arguments regarding application of the Carter case.

### Facts

An earlier Report and Recommendation summarized the salient facts surrounding Smith's claim:

> The incident giving rise to this action occurred at the Leland Olds Station (Leland Olds), a coal-fired generating plant near Stanton, North Dakota. Basin owns Leland Olds. Between 2007 and 2011, Basin engaged in a large-scale retrofit project to reduce Leland Olds' sulfur dioxide emissions.
>
> Basin contracted with defendant Sargent Lundy to provide engineering, design, procurement, and construction management services for the retrofit project. The project included installation of large tanks—approximately 60 feet tall and 60 feet in diameter—outside the existing plant structure. Basin contracted with Hartman Walsh, a painting

---

[1] None of the parties cited the case in their briefs on any of the previous motions.

and coatings contractor, to install internal coatings on the tanks. Under the contract, Hartman Walsh was to install an industrial coating product manufactured by Duromar. Basin's contract with Hartman Walsh required that a Duromar technical field representative oversee some aspects of Hartman Walsh's work. Smith acted as that Duromar representative at the Leland Olds site.

On the date of the incident, Smith arrived at Leland Olds to inspect Hartman Walsh's coating installation inside Tank 2. Tank 2 was located in a new construction area away from the plant itself. Smith had inspected Hartman Walsh's coating installation on another tank eight or nine months earlier, and so was familiar with the project site.

Smith had contacted Hartman Walsh's crew prior to arriving at Leland Olds that day, so he knew when the coating installation was to begin. Upon his arrival, Smith saw two Hartman Walsh employees, Andy Jenkins and Jeff Stone, near Tank 2 and recognized them from his prior inspection at Leland Olds. Approximately six Hartman Walsh employees were working inside Tank 2; two were "safety men" on the ground inside the tank and the others were working from elevated platforms using "access climbers" to elevate them to the tank ceiling to apply the Duromar coating. Three other Hartman Walsh employees—Jenkins, Stone, and a safety attendant—were working outside Tank 2.

Smith entered Tank 2 after the Hartman Walsh safety attendant confirmed that Smith was wearing the proper equipment to enter the tank (safety glasses, hard hat, steel tipped shoes, and a particulate respirator on his sleeve). Smith entered the tank through a manhole that was 24 to 36 inches in diameter.

Shortly after Smith entered Tank 2, the Hartman Walsh employees noted a malfunction of an access climber, which necessitated an interruption in application of the coating. The coating materials applied inside Tank 2 were being transferred from a Hartman Walsh trailer into Tank 2 via "hose bundles." In order to flow through the hoses, it was necessary to heat the coating materials to a specific temperature. Because of the access climber malfunction, the coating that was in the spray line had to be purged quickly so that it would not cool and solidify—and thus damage the application equipment—while the work was interrupted. To flush the spray line, Hartman Walsh employees used MEK. A Hartman Walsh employee working from the elevated platform inside Tank 2 discharged his spray applicator, resulting in Smith being exposed to MEK while standing on the floor of Tank 2.

Smith estimates that he was exposed to MEK for three to five minutes. He describes inhalation of the MEK causing him to panic, cough, and retch.

Smith exited the tank through the manhole and told Jenkins and Stone that the tank was a toxic environment.

After exiting Tank 2, Smith climbed to the top of it and took various photographs. He also walked around Tank 2 and noticed an air mover and dehumidifier which were not being used to evacuate contaminated air from, or provide fresh air to, Tank 2. Smith testified that Jenkins told him that the air handling equipment was not used so that others working on the site would not have to smell the coating material.

Later in the day, Smith experienced dizziness and left the job site. He drove himself to Bismarck, but stopped along the way because he was sick and vomited. The next morning, he vomited blood and was taken by ambulance to a Bismarck hospital. At the hospital, physicians diagnosed Mallory Weiss syndrome—that is, a tear in the tissue connecting the esophagus to the stomach. Smith was hospitalized and discharged three days later. He returned to work four days after his discharge, with no work restrictions. Smith describes continuing symptoms, including mental health disorders, loss of quality of life, and symptoms stemming from damage to his esophagus. (Doc. #98, p. 8).

Following the incident, there was a dispute about whether Smith was an independent contractor or a Duromar employee. In 2011, he settled a Minnesota workers compensation claim against Duromar and its carrier for $53,000. He separately settled with Duromar for any claims, other than workers compensation claims, arising from the incident for the sum of $2,000.

(Doc. #161, pp. 2-4).

Smith's release of any non-workers compensation claims against Duromar states:

It is further agreed that the settlement herein is in accord with and with the same effect as the release used in Pierringer v. Hoger, 124 N.W.2d 106 (Wisc. 1963), and its progeny, including Frey v. Snelgrove, 269 N.W.2d 918 (Minn. 1978).

. . . .

As a further consideration for this Release, Robert C. Smith agrees to indemnify and hold harmless Duromar, Inc. from any claim for contribution, indemnity or subrogation made or to be made by any other party or entities that may be at fault and share responsibility for the damages and injuries incurred by him, and he further agrees to satisfy such fraction, portion or percentage of the judgment as the causal negligence or fault of Duromar, Inc.

is adjudged or determined to be of all causal negligence or fault of all tortfeasors. In the event that the undersigned fails to immediately satisfy any of the agreements listed or contained in this document, he does hereby consent and agree that upon filing a copy of this agreement, without further notice an Order may be entered by the court by which said judgment is entered directing the clerk thereof to satisfy such judgment to the extent of such fraction, portion or percentage of negligence or fault found against Duromar, Inc.

(Doc. #90-2, pp. 3-4).[2]

Smith contends that, when he signed that agreement, he was not aware of Duromar's indemnification agreement with Hartman Walsh.[3] He asserts that

---

[2] Smith's workers compensation settlement agreement included the following:

It is the intention of [Smith], Duromar, Inc., Chartis Insurance, and the Special Compensation Fund that this Stipulation for Settlement has the same effect as releases, settlements and/or agreements used in the cases of Pierringer v. Hoger, 124 N.W.2d 106 (Wisc. 1963) and Frey v. Snelgrove, 269 N.W.2d 918 (Minn. 1978) and that this settlement be bound by and interpreted in light of those decisions. The parties incorporate by reference the principals and theories set forth in the Pierringer and Frey cases into this Stipulation for Settlement. Further, [Smith] agree[s] to indemnify Duromar, Inc. and Chartis Insurance, and their heirs, administrators, executors, successors and assigns, and hold them harmless for any and all claims for contribution and indemnity made by or to be made by the other parties or persons who may be at fault and share responsibility for the alleged July 15, 2009 incident and [Smith's] resulting injury and damage.

(Doc. #90-1, pp. 5-6).

[3] Duromar's vendor agreement with Hartman Walsh provides:

To the fullest extent allowed by law including but not limited to claims of incidence [sic] up to seven years prior and in compliance with project contract documents [Duromar] agrees to indemnify, hold harmless, and defend [Hartman Walsh], Owner, Other Site Contractors and Lenders (the "Indemnified Parties") from and against any losses arising out of but not limited to:

    1.    Injury, illness or death of any persons of [Duromar's] employees' agents and representatives. . . . .

"Duromar's failure to disclose the other indemnification agreements to [him] was a mistake that negated his consent to his purported indemnity agreement with Duromar." (Doc. #197, p. 5). Smith argues that to interpret his agreement with Duromar as including his indemnification of Duromar for its contractual obligations was not intended and results in an "unintended de facto release of all tortfeasors." Id. at 8.

**Law and Discussion**

Smith asserts a right to relief under both Rule 60(b)(1) and (b)(6), which provide: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect;. . . or (6) any other reason that justifies relief."

Smith argues relief is warranted under Rule 60(b)(1) because, when acting pro se, he "was buried by a flurry of motions from multiple defendants and, due to excusable neglect and inexperience in the law, was not able to adequately respond to the

_____

(Doc. #80-1).

The pertinent part of the Basin/Hartman Walsh contract provides:

To the maximum extent permitted by law, [Hartman Walsh] shall defend, indemnify, and hold harmless [Basin] and [Sargent Lundy] and [Basin] and [Sargent Lundy's] directors, officers, and employees from all claims, causes of action, losses, liabilities, and expenses (including reasonable attorney's fees) for personal loss, injury, or death to persons (including but not limited to [Hartman Walsh's] employees) . . . in any manner arising out afar [sic] connected with the Contract, or the materials or equipment supplied or services performed by [Hartman Walsh], its subcontractors and suppliers of any tier.

(Doc. #17-2, pp. 2-3).

allegations made in the various motions." (Doc. #197, p. 3). Additionally, he contends that the defendants were not entitled to judgment as a matter of law, that this lawsuit involves a serious injury, and that "denial of his right to pursue his claims would be a manifest miscarriage of justice." Id. He identifies eleven motions filed during a two-month period and contends that, to the extent he did not timely respond to some of those motions, his failure to do so was because of excusable neglect.[4] To support his position, he points to the long-held principle that documents prepared by non-lawyers are to be liberally construed. (Doc. #202, p. 4).

Relief under Rule 60(b) is an extraordinary remedy that lies within the discretion of the district court. United States v. Mask of Ka-Nefer-Nefer, 752 F.3d 737, 743 (8th Cir. 2014); Noah v. Bond Cold Storage, 408 F.3d 1043, 1045 (8th Cir. 2005).

Smith cites no case law finding similar circumstances to constitute excusable neglect under Rule 60(b)(1). And the court's research identifies none. Cf. Bennett v. Dr. Pepper/Seven Up, Inc., 295 F.3d 805, 808-809 (8th Cir.2002) (affirming district court's finding that an educated and reasonably articulate pro se litigant's failure to understand procedures for timely responding to summary judgment motion did not constitute excusable neglect under Rule 60(b)(1)).

In addition to asserting excusable neglect, Smith argues "mistake." He contends that Rule 60(b)(1) encompasses "any type of mistake or error on the part of the court, including judicial mistake as to applicable law." Id. The defendants and Duromar counter that Fox v. Brewer, 620 F.2d 177, 180 (8th Cir. 1980) holds that relief under

---

[4] Review of the docket shows Smith did not respond to Hartman Walsh's motion for summary judgment. See Doc. #161, p. 6.

8

Rule 60(b)(1) is not available for "judicial error other than judicial inadvertence."
Smith's reply suggests that the holding of <u>Fox</u> should be "revisited" in light of 2009
amendments to Federal Rule of Appellate Procedure 4(a)(A)(vi), which relate to stay of
appeals pending resolution of Rule 60(b) motions.

      In a case decided after the amendment of Rule 4(a)(A)(vi), the Eighth Circuit
stressed that Rule 60 is not intended as a substitute for direct appeal, emphasizing that
the proper recourse when a party disagrees with a district court's interpretation of the
law is "a direct appeal, not a Rule 60(b) motion." <u>Mask of Ka-Nefer-Nefer</u>, 752 F.3d at
743. And district courts in the Eighth Circuit continue to follow <u>Fox</u> in holding that a
claim of legal error is not a "mistake" within the meaning of Rule 60(b)(1). In <u>Combs v.
Cordish Companies, Inc.</u>, the court discussed Rule 60(b)(1)'s use of the terms "mistake"
and "inadvertence." The court stated:

> Rule 60(b)(1) permits a possibility of relief for both "mistake" and
> "inadvertence." However, distinguishing between the two is important,
> because "[i]t remains the law in this Circuit that 'relief under Rule 60(b)(1)
> for judicial error other than for judicial inadvertence' is not available." While
> "judicial inadvertence" is not clearly defined in decisions of the Eighth
> Circuit, one thing appears clear: a claim of legal error is not judicial
> inadvertence.

No. 14-0227-CV-W-ODS, 2015 WL 5096174, at *5 (W.D. Mo. Aug. 28, 2015) (internal
citation omitted). <u>See also</u> <u>EEOC v. CRST Van Expedited, Inc.</u>, No. 07-CV-95-LRR, 2017
WL 4873070, at *2 (N.D. Iowa Oct. 27, 2017); <u>Brown v. Louisiana-Pacific Corp.</u>, No.
4:12-cv-00102-SMR-HCA, 2015 WL 11117315, at *3 (S.D. Iowa Mar. 13, 2015). Smith's
claim of judicial mistake is a claim of legal error, not a claim of inadvertence. Rule
60(b)(1) can provide no relief on the basis of judicial mistake.

In addition to asserting a right to relief under Rule 60(b)(1), Smith argues a right to relief under Rule 60(b)(6), the rule's catch-all provision. The catch-all provision of Rule 60(b)(6)—"any other reason that justifies relief"—encompasses only "exceptional circumstances that would have prevented [a party] from obtaining a fair opportunity to litigate his claim or receiving an adequate redress." Murphy v. Mo. Dep't of Corrs., 506 F.3d 1111, 1117 (8th Cir. 2007). But "exceptional circumstances" are, as the term implies, exceedingly rare. "Exceptional circumstances are not present every time a party is subject to potentially unfavorable consequences as a result of an adverse judgment properly arrived at." In re Guidant Corp., 496 F.3d 863, 868 (8th Cir. 2007). Neither Smith's pro se status, nor the pendency of multiple motions, can be considered exceptional circumstances within the meaning of Rule 60(b)(6). Though recognizing the preference for decisions on the merits, which Smith asserts, (Doc. #202, p. 5), that preference cannot override the strictures of Rule 60(b).[5]

## Conclusion

For the reasons discussed above, this court recommends that Smith's motion for relief be **DENIED**.

Dated this 5th day of February, 2018.

/s/ Alice R. Senechal
Alice R. Senechal
United States Magistrate Judge

---

[5] Smith argues he timely filed this motion, having filed it within 28 days of entry of final judgment. (Doc. #202, p. 5 n.1). In fact, judgment on Smith's complaint was entered on March 6, 2017, well more than 28 days before he filed the current motion. (Doc. #177). A second judgment, entered July 19, 2017, concerns only Basin's cross-claim against Hartman Walsh. (Doc. #196).

10

**NOTICE OF RIGHT TO OBJECT**

Pursuant to Federal Rule of Civil Procedure 72(b) and District of North
Dakota Civil Local Rule 72.1(D)(3), any party may object to this Report and
Recommendation by filing with the Clerk of Court, no later than **February 20, 2018**, a
pleading specifically identifying those portions of the Report and Recommendation to
which objection is made and the basis of any objection. Failure to object or to comply
with this procedure may forfeit the right to seek review in the Court of Appeals.

11